[Cite as *In re B.M.H.*, 2025-Ohio-5180.]

# IN THE COURT OF APPEALS OF OHIO
# ELEVENTH APPELLATE DISTRICT
# LAKE COUNTY

IN THE MATTER OF:

B.M.H. AND F.L.H.,
DEPENDENT CHILDREN

**CASE NOS. 2025-L-064
2025-L-065**

Civil Appeals from the
Court of Common Pleas,
Juvenile Division

Trial Court Nos. 2022 DP 00869
2022 DP 00870

## OPINION AND JUDGMENT ENTRY

Decided: November 17, 2025
Judgment: Affirmed

*Josephine L. Begin*, Manning & Clair, Attorneys at Law, 38040 Euclid Avenue, Willoughby, OH 44094 (For Appellant, Ethann Putman).

*Christopher J. Boeman*, Lake County Department of Job & Family Services, 177 Main Street, Painesville, OH 44077 (For Appellee, Lake County Department of Job and Family Services).

*John W. Shryock*, John Shryock Co., L.P.A., 30601 Euclid Avenue, Wickliffe, OH 44092 (Guardian ad litem).

*Pamela D. Kurt*, Kurt Law Office, L.L.C., 30432 Euclid Avenue, Suite 116, Wickliffe, OH 44092 (For Minor, B.M.H.).

*Jerri Mitchell*, P.O. Box 1126, Fairport Harbor, OH 44077 (For Minor, F.L.H.).

EUGENE A. LUCCI, J.

{¶1} Appellant, E.P. ("Father"), appeals the judgments of the Lake County Court of Common Pleas, Juvenile Division, granting permanent custody of his two children

(B.M.H. and F.L.H.) to the Lake County Department of Job and Family Services ("LCDJFS").

{¶2}    At issue in this matter is whether the trial court erred in denying Father's motion to dismiss where LCDJFS allegedly failed to present clear and convincing evidence that it made reasonable efforts toward reunification. Father additionally contends that the award of permanent custody to LCDJFS was against the manifest weight of the evidence because it was contrary to the children's best interests and/or its finding that the children could not be placed with him in a reasonable period of time. Finally, Father asserts he was denied effective assistance of counsel because trial counsel failed to adequately investigate or obtain relevant records relating to his case-plan goal(s). We affirm.

{¶3}    The underlying cases originated in the Lake County Court of Common Pleas, Juvenile Division, commencing with the August 9, 2022 granting of emergency custody to LCDJFS of seven minor children:  M.S.R.H. (DOB: 7/23/08), M.J.H. (DOB: 3/5/10), B.M.H. (DOB: 5/16/11), B.R.H (DOB: 11/22/12), C.L.H. (DOB: 10/18/14), C.A.H. (DOB: 10/24/15), and F.L.H. (DOB: 4/11/17). B.M.H. and F.L.H., Father's son and daughter, are the only children specifically relevant to the instant appeal.

{¶4}    Initially, C.H. (hereinafter "Mother"), the biological mother of all children subject to the proceedings below, was present with counsel and agreed to LCDJFS' temporary custody of all children due to housing issues. The guardian ad litem ("GAL"), John Shryock, appointed to the cases was also present. Father was also present. Father also agreed that the children should continue in LCDJFS' temporary custody.

Case Nos. 2025-L-064 and 2025-L-065

{¶5} On November 1, 2022, the children were adjudicated dependent. On November 9, 2022, a disposition was held and Mother agreed to a case plan, which the trial court adopted. Mother's case plan goals required her to obtain safe and stable housing, complete a mental health assessment and follow recommendations from the assessment, and complete a drug and alcohol assessment and follow the recommendations from the assessment. Father's case plan required him to obtain a dual diagnostic assessment, including both a mental health assessment and a drug and alcohol assessment.

{¶6} On March 2, 2023, LCDJFS filed a show-cause motion alleging Mother was not in compliance with or working toward her case plan goals. On March 16, 2023, LCDJFS filed a similar motion against Father. A trial was scheduled on the motions to show cause; neither Mother nor Father appeared. Mother, however, via counsel, moved for a continuance. The trial court granted the motion for continuance. A warrant was issued for Father's arrest for failure to appear. Father did not appear at any hearing from July 26, 2023, to August 8, 2024, – the date on which the trial court set the trial on the motion for permanent custody.

{¶7} Various review hearings and extension hearings were held throughout the pendency of these cases.

{¶8} On August 1, 2023, a hearing was held on the first six-month extension of temporary custody to LCDJFS. Mother was excused because she had previously indicated she agreed with the motion. Father did not attend the hearing. Temporary custody was accordingly extended with the magistrate finding that (1) Mother "does not have stable housing" for the children, (2) "reasonable efforts were made to avoid

continued removal" of the children from the home, and (3) neither Mother nor Father were case-plan compliant.

{¶9} On February 28, 2024, a hearing was held on the second extension of temporary custody to LCDJFS. Neither Mother nor Father attended. In extending temporary custody, the magistrate determined that (1) "reasonable efforts were made to avoid continued removal," (2) Mother "does not have stable housing," (3) "Mother was recently incarcerated," (4) "Mother discontinued counseling services in July of 2023," and (5) neither Mother nor Father were case-plan compliant.

{¶10} On May 7, 2024, LCDJFS filed for permanent custody. At the time of the filing, the children had been in LCDJFS' temporary custody for 20 months and 18 months had elapsed since the adjudication. A pretrial on the motion was held on July 11, 2024; Mother was present with counsel, but, although duly served, Father was not present.

{¶11} The motion for permanent custody was set for trial on August 8, 2024. Mother was present with counsel. Father attended and, for the first time, requested court-appointed counsel. The trial was continued in part due to Father's request for counsel and in part because none of the children had court-appointed counsel.

{¶12} On September 20, 2024, a pretrial occurred relating to Mother's emergency motion to resume visitation, filed on August 15, 2024. Mother, however, did not attend despite being duly notified. Father was present with counsel.

{¶13} On October 31, 2024, a pretrial was held on Mother's motion for LCDJFS to pay for a custody evaluation. LCDJFS did not object, despite the pendency of the motion for permanent custody. At the time, the children had been in LCDJFS' temporary

Case Nos. 2025-L-064 and 2025-L-065

custody for 26 months. The motion was granted and, pursuant to Mother's request, Dr. Ryan Mekota was appointed to conduct the evaluation.

{¶14} Because of difficulties accommodating the schedules of the GAL, seven attorneys for the children, and counsel for both Mother and Father as well as LCDJFS, a new trial date was not scheduled until April 2, 2025. The three-day trial commenced on that date. The trial court granted LCDJFS' motion for permanent custody on May 8, 2025. Father now appeals.

## Standard of Review

{¶15} The Supreme Court of Ohio set forth the appropriate standard of review for appellate challenges to a trial court's granting of a motion for permanent custody in *In re Z.C.*, 2023-Ohio-4703. In that case, the Court observed:

> Given that R.C. 2151.414 requires that a juvenile court find by clear and convincing evidence that the statutory requirements are met, we agree with those appellate courts that have determined that the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination, as appropriate depending on the nature of the arguments that are presented by the parties.
>
> . . .
>
> Sufficiency of the evidence and manifest weight of the evidence are distinct concepts and are "'both quantitatively and qualitatively different.'" *Eastley v. Volkman*, . . . 2012-Ohio-2179, . . .¶ 10, quoting *State v. Thompkins*, 78 Ohio St.3d 380 . . . (1997), paragraph two of the syllabus. We have stated that "sufficiency is a test of adequacy," *Thompkins* at 386, while weight of the evidence "'is not a question of mathematics, but depends on its *effect in inducing belief*'" (emphasis sic), *id.* at 387, quoting *Black's Law Dictionary* 1594 (6th Ed.1990). "Whether the evidence is legally sufficient to sustain a verdict is a question of law." *Id.* at 386. "When applying a sufficiency-of-the-evidence standard,

Case Nos. 2025-L-064 and 2025-L-065

a court of appeals should affirm a trial court when "'the evidence is legally sufficient to support the jury verdict as a matter of law.'"" *Bryan-Wollman v. Domonko*, . . . 2007-Ohio-4918 . . ., ¶ 3, quoting *Thompkins* at 386, quoting *Black's* at 1433.

But "even if a trial court judgment is sustained by sufficient evidence, an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence." *Eastley* at ¶ 12. When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *Id*. at ¶ 20. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *Id.* at fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978).

*In re Z.C.* at ¶ 11, 13-14.

{¶16} Father's first assignment of error alleges:

{¶17} "The trial court ruled against the sufficiency of the evidence in awarding permanent custody to DJFS under R.C. 2151.414(E)(1) after relying on prior reasonable efforts findings to dispense with DJFS's blatant admission that reasonable case planning and diligent efforts ceased to be offered to appellant in the 10+ months after it filed for permanent custody on May 7, 2024."

{¶18} Father argues that the trial court erred in finding that LCDJFS produced sufficient evidence to establish it made reasonable efforts to prevent the removal and continued removal of the children from the home, pursuant to R.C. 2151.419(A)(1). Father contends that LCDJFS conceded it ceased reunification efforts after it filed the motion for permanent custody on May 7, 2024. As a result, Father maintains LCDJFS failed to meet its statutory obligations.

**Reasonable Efforts**

{¶19} "When the state intervenes to protect a child's health or safety, '[t]he state's efforts to resolve the threat to the child before removing the child or to permit the child to return home after the threat is removed are called "reasonable efforts.""" *In re C.F.,* 2007-Ohio-1104, ¶ 28, quoting Will L. Crossley, *Defining Reasonable Efforts: Demystifying the State's Burden Under Federal Child Protection Legislation*, 12 B.U.Pub.Int.L.J. 259, 260 (2003). Various sections of the Ohio Revised Code set forth an agency's duty to make reasonable efforts; the concept is not encompassed in a single section. *In re C.F.* at ¶ 29.

{¶20} LCDJFS filed its motion for permanent custody pursuant to R.C. 2151.413. Pursuant to R.C. 2151.419(A)(1), the agency that removed the child from the home must have made reasonable efforts to prevent the removal of the child from the child's home, eliminate the continued removal of the child from the home, or make it possible for the child to return home safely. The statute assigns the burden of proof to the agency to demonstrate it has made reasonable efforts. *Id.*

{¶21} The statutory requirement that a court shall determine whether an agency has made reasonable efforts to return a child to the parents' home, however, does not

Case Nos. 2025-L-064 and 2025-L-065

apply in a permanent custody proceeding. *In re C.F.* at ¶ 41-42. Instead, the "reasonable efforts" requirement applies at other, earlier stages of the proceeding. *Id.*

{¶22} "R.C. 2151.419 *does not apply* in a hearing on a motion for permanent custody filed pursuant to R.C. 2151.413 and R.C. 2151.414. . . . [T]his does not mean that the agency is relieved of the duty to make reasonable efforts." (Emphasis added.) *In re J.J.F.*, 2009-Ohio-4736, at ¶ 24 (5th Dist.), citing *In re C.F.*, 2007-Ohio-1104, at ¶ 42. Instead, "'the agency may be required under other statutes to prove that it has made reasonable efforts toward family reunification.'" " *In re J.J.F.* at ¶ 24, quoting *In re C.F.* at ¶ 42. However, "[i]f the agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time." *In re C.F.* at ¶ 43.

{¶23} Thus, it is only when the agency "has not already proven reasonable efforts [that the agency] must do so at the hearing on the motion for permanent custody hearing." *Id.* at ¶ 4, 43. The Supreme Court in *In re C.F.* emphasized that the trial court had made findings as to reasonable efforts throughout that case. The reasonable efforts findings were made at the removal, adjudication, temporary custody, and review hearings. *Id.* at ¶ 45. Consequently, there was no need to re-establish the efforts at the permanent custody hearing. *Id.*

{¶24} In this matter, on November 1, 2022, at the adjudicatory hearing finding the children dependent, the magistrate determined that LCDJFS had been working with Mother to secure housing for herself and the children. At the time of the hearing, the magistrate noted that the "putative father" failed to appear "although duly served and notified."

{¶25} The magistrate further determined that Mother related to LCDJFS that she could no longer care for the children and agreed to grant LCDJFS temporary custody. Although the magistrate did not use the "reasonable efforts" language in his decision, we conclude the statements in the decision reflect LCDJFS' reasonable efforts at the time of the adjudicatory hearing. Neither Mother nor Father ("putative" or otherwise) challenged this decision.

{¶26} On November 9, 2022, a dispositional hearing was held wherein Mother's case plan was set forth. Again, the magistrate observed the "putative father" was served but failed to appear. Father, in his appellate brief, acknowledges he was provided a single case-plan goal – completion of a dual diagnostic assessment which required a mental health and alcohol/drug assessment.

{¶27} One of the primary goals of Mother's case plan was for her to obtain stable housing. The magistrate found that while Mother lost her "extended housing," LCDJFS continued to work with Mother to secure housing for the minor children as well as Mother. The magistrate reiterated Mother's statement that she could no longer care for the children. Nevertheless, in his "decision", the magistrate found that "[r]easonable efforts have been made to prevent the continued need to remove the above named child[ren] from the home, however, placement in the home at this time is contrary to the child[ren]'s best interests." Neither Mother nor Father "challenged" this decision.

{¶28} On July 26, 2023, during a review hearing on an extension of temporary custody, Mother and Father were present. Father moved to continue the hearing. The magistrate granted the motion. The hearing was continued and scheduled for August 1, 2023.

Case Nos. 2025-L-064 and 2025-L-065

{¶29} On August 1, 2023, a hearing was held before the magistrate on LCDJFS' motion to extend temporary custody. Father was absent from this hearing.

{¶30} In his "decision", the magistrate found that "reasonable efforts were made to avoid continued removal of the child[ren] from the home, but that removal from the home at this time is in the child[ren]'s best interest." The magistrate further determined that Mother did not have stable housing, and that Mother was not compliant with the case plan goals enumerated in the November 9, 2022 decision. Again, neither Mother nor Father challenged this decision.

{¶31} Next, on February 28, 2024, a hearing was conducted before the magistrate on LCDJFS' second motion to extend temporary custody. Father did not attend this hearing.

{¶32} Like the previous "decision", the magistrate determined that "reasonable efforts were made to avoid continual removal of the child[ren] from the home, but that removal from the home at this time is in the child[ren]'s best interest." The magistrate further concluded that Mother had not yet obtained stable housing and was "recently incarcerated." The magistrate also found that Mother "discontinued counseling services in July 2023[,]" another condition of Mother's case plan. The magistrate accordingly determined Mother was not compliant with her case plan goals. Neither Mother nor Father challenged this decision.

{¶33} On July 11, 2024, a pretrial was held, post-LCDJFS' motion for permanent custody. Father again failed to appear.

{¶34} On August 8, 2024, the parties convened for a hearing on LCDJFS' motion for permanent custody. Father appeared and requested the assistance of appointed

counsel. As a result, the magistrate granted a continuance; LCDJFS withdrew its March 16, 2023 motion to show cause. Also, the trial court recalled the warrant for Father's arrest.

{¶35} Later, on October 31, 2024, a pretrial was held on Mother's motion for custody evaluation. LCDJFS did not object and the matter was continued for final trial until the beginning of April 2025. Father did not appear at the October 2024 hearing.

{¶36} In addition to these points, the record demonstrates that even though LCDJFS had tried to assist Mother to obtain housing, Mother claimed she was already working with Lake County Metropolitan Housing Authority. Specifically, according to Mother's social worker, Samantha Priggins, Mother

> had always indicated to me every time we talked that she was working with LMHA. So that's a resource I would have provided to her, but she was working with LMHA. We had also spoke to her about the property source that the Department would offer, but she did have an eviction on her record, and I did inform her she would need to pay her eviction off and go to the court, have her eviction get expunged, and to my knowledge, she did not do that.

{¶37} According to Ms. Priggins, "the most important piece of this case was the housing situation and, reunification couldn't happen if there wasn't stable housing."

{¶38} Additionally, Mother initially had one hour of visitation per week with all of her children at LCDJFS. According to Ms. Priggins, Mother was "pretty consistent" in attending visits although "she missed some visits, and was late to a lot of them." And, eventually, Mother requested that her visits occur only once a month even though she was permitted to visit weekly with six of the seven children. Mother's request was premised upon transportation issues. Ms. Priggins recognized she did not provide Mother with bus passes or gas cards, but Mother did not ask for such benefits.

Case Nos. 2025-L-064 and 2025-L-065

{¶39} Moreover, Ms. Priggins repeatedly advised Father that he needed to provide the dual assessments required by his case plan. Ms. Priggins stated she spoke with Father "every couple weeks" and explained "he needed to get an updated mental health assessment and drug and alcohol assessment." Ms. Priggins, however, was unable to verify whether Father had the assessment.

{¶40} Additionally, Shara Sohl was assigned as social worker after Ms. Priggins. She met Father one time in person at a semiannual review in January 2025. She asked Father if he could verify that he had engaged in mental health treatment as well as drug and alcohol treatment. Father indicated "he was working on getting them." Father, however, did not disclose or indicate from where he was seeking the alleged assessments he was "working on." Ms. Sohl, in March 2025, again asked Father if he had verification of participating in the case-plan services. He did not.

{¶41} We acknowledge that, during the pendency of the case, Father expressed a desire to care and have custody for his children. Ms. Priggins visited Father at his initial residence and at a residence he had at the time of trial. Ms. Priggins stopped visiting Father off-site because of "safety concerns" with Father's intoxication and a previous remark Father made to her regarding a young boy who had a crush on F.L.H. (Father indicated he would kill the boy who had a crush on the girl). Further, Ms. Priggins noted that Father responded inappropriately to F.L.H. when taking a picture; to wit, he stated, "she doesn't need these dumb ass glasses" and ripped them offer the child's face and tossed the glasses to the ground.

{¶42} Finally, once Dr. Mekota was appointed for a custody evaluation, he attempted to contact Father. Dr. Mekota reached Father via telephone and, upon

Case Nos. 2025-L-064 and 2025-L-065

introducing himself, Father responded "nobody cares about your title." According to the doctor, Father was consistently hostile.

{¶43} Dr. Mekota related that Father simply presumed he would be granted custody of his children and could then immediately move to California. Dr. Mekota had concerns about Father's housing arrangements, mental health issues, and substance abuse/alcohol issues. According to the doctor, Father was underemployed at the time of the conversation and did not have transportation.

{¶44} Under the circumstances, the magistrate, on four separate occasions, acknowledged that "reasonable efforts" were made to avoid the continued removal of the children. And the magistrate acknowledged Mother was not compliant with her case plan. Father, on the other hand, did not attend most pretrial and extension hearings. It is also obvious that Father was not compliant with his basic case-plan goals. If either party disagreed with the magistrate's determinations, they could have raised appropriate challenges in the trial court. They did not do so. These points, in addition to Father's acts and omissions in relation to his case-plan goals as well as testimony regarding (1) Father's housing, (2) Father's underemployment, (3) Father's intoxication at visits, and (4) Father's apparent and general hostility during the proceedings bear more upon the reasonableness of Father's efforts than the reasonableness of the efforts of LCDJFS.

{¶45} Given the evidence, as well as the magistrate's determinations, we conclude LCDJFS made reasonable efforts to prevent the removal of the children or eliminate the continued removal of the children from the parents' home/custody.

{¶46} Father's first assignment of error lacks merit.

{¶47} Father's second and third assignments of error provide:

Case Nos. 2025-L-064 and 2025-L-065

[2.] The trial court's finding under R.C. 2151.414(E)(2) is against the manifest weight of the evidence and not supported by clear and convincing evidence. The record lacks current, competent proof that appellant's alleged chemical dependency rendered him unable to provide an adequate permanent home at the time of hearing.

[3.] The trial court's finding under R.C. 2151.414(E)(4) is against the manifest weight of the evidence and not supported by clear and convincing evidence. The record lacks current, competent proof that, when able, appellant failed to regularly support, visit or communicate with the child[ren], or that he otherwise acted with an unwillingness to provide an adequate permanent home at the time of hearing.

## Standards for Granting a Motion for Permanent Custody

{¶48} R.C. 2151.414(B)(1) specifies that a trial court may grant a children services' agency permanent custody of a child if the court finds, by clear and convincing evidence, that (1) the child's best interest would be served by the award of permanent custody, and (2) any of the following conditions applies:

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period, or the child has been in the temporary custody of one or more public children services agencies or private child

Case Nos. 2025-L-064 and 2025-L-065

placing agencies for 12 or more months of a consecutive 22-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

{¶49} In the case at bar, the juvenile court found that R.C. 2151.414(B)(1)(d) applies. Father does not dispute this finding but instead argues that the juvenile court's determination placing the children in LCDJFS' permanent custody was in the children's best interest was against the manifest weight of the evidence.

{¶50} R.C. 2151.414(D)(1) requires a trial court to consider all relevant, as well as specific, factors to determine whether a child's best interest will be served by granting a children services agency permanent custody. The specific factors include: (1) the child's interaction and interrelationship with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the child's wishes, as expressed directly by the child or through the child's guardian ad litem, with due regard for the child's maturity; (3) the child's custodial history; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any factors listed under R.C. 2151.414(E)(7) to (11) apply.

{¶51} Determining whether granting permanent custody to a children services agency will promote a child's best interest involves a delicate balancing of "'all relevant [best interest] factors,'" as well as the "five enumerated statutory factors." *In re C.F.*, 2007-Ohio-1104, at ¶ 57, quoting R.C. 2151.414(D). None of the best interest factors, however,

requires a court to give it "greater weight or heightened significance." *C.F.* at ¶ 57, citing *In re Schaefer*, 2006-Ohio-5513, ¶ 56. Instead, the trial court considers the totality of the circumstances when making its best interest determination. *In re K.M.S.*, 2017-Ohio-142, ¶ 24 (3d Dist.); *In re A.C.*, 2014-Ohio-4918, ¶ 46 (9th Dist.). In general, "[a] child's best interest is served by placing the child in a permanent situation that fosters growth, stability, and security." *In re C.B.C.*, 2016-Ohio-916, ¶ 66 (4th Dist.), citing *In re Adoption of Ridenour*, 61 Ohio St.3d 319, 324 (1991).

{¶52} Father contends the trial court's findings pursuant to R.C. 2151.414(E)(2) and (E)(4) are unsupported by the evidence and thus the award of permanent custody to LCDJFS was against the manifest weight of the evidence.

{¶53} Initially, because the trial court made the "12 in 22" finding under R.C. 2151.414(B)(1)(d), which Father does not dispute, any findings made pursuant to R.C. 2151.414(E)(2) and (4) are statutorily superfluous. That is, these findings relate to a determination that the children cannot be placed with the parent within a reasonable time or should not be placed with the parent. *See* R.C. 2151.414(B)(1)(a). The trial court did not enter a finding reflecting this conclusion. Even though these "factors" were unnecessary to the court's legal determination, the trial court's factual findings entered under these subsections serve as additional, relevant bases to support the court's conclusion. *See* R.C. 2151.414(D)(1) (in determining the best interest of the child, "the court shall consider all relevant factors"). Accordingly, we shall consider Father's arguments.

{¶54} Although the trial court captioned its finding pursuant to R.C. "2151.414(B)(2)," we consider this a clerical error. The trial court's finding was entered

Case Nos. 2025-L-064 and 2025-L-065

pursuant to R.C. 2151.414(E)(2). That said, the relevant sections at issue provide, in relevant part:

> (E) In determining at a hearing held pursuant to division (A) of this section . . . whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section . . . that one or more of the following exist as to each of the child's parent, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:
>
> . . .
>
> (2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section. . .
>
> . . .
>
> (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child. . . .

{¶55} Here, the trial court determined, pursuant to R.C. 2151.414(E)(2) that "Father has significant chemical dependency issues. Both Mother and [Father] have become uncooperative and refuse to provide access for [LCDJFS]." Father first maintains there was insufficient evidence submitted at trial that Father had "significant chemical dependency issues." We do not agree.

{¶56} Dr. Mekota testified that:

Synthesizing all available dat[a], there was clear indication that there was either personality related male adaptive traits and issues and, therefore, considered mental health problems as well as how some of the concerns foster parents brought up regarding what they felt were threats or inappropriate statements made to them or about the kids or the foster parents directly, you know, concerns about substance abuse for which there were multiple DUIs or alcohol-related offenses.

{¶57} In addition, Leya Belnavis, employed with Signature Health as F.L.H.'s caseworker, reported that the child told her that Father smelled like beer. Ms. Belnavis did not recommend F.L.H. resume visits with Father stating he "has to take care of individual needs and ensure that he is taken care of, so he can ensure [F.L.H.] feels safe around him."

{¶58} F.L.H.'s foster mother, B.W., also testified that Father called her asking for money to attend a visit with F.L.H. When the foster parents told him no, he started swearing. Father also left the foster parents harassing voicemails stating, "I am coming for my kids" and "you better not be hurting them or else." Additionally, Father was disruptive and hostile at agency visits. Ms. Priggins met with Father and found him verbally aggressive and ostensibly drunk at one visit with F.L.H. As noted above, upon discovering a boy had a crush on F.L.H., he indicated a desire to kill the young boy. Father additionally criticized F.L.H.'s eyewear remarking "she doesn't need these dumbass glasses."

{¶59} Finally, Father did not attend many of the hearings and was not compliant with his case-plan goals of obtaining mental-health and substance-abuse assessments.

{¶60} In light of these points, we conclude there was sufficient, credible evidence upon which the trial court could make a reasonable finding under R.C. 2151.414(E)(2).

Case Nos. 2025-L-064 and 2025-L-065

{¶61} Father further argues the record is "absolutely devoid of evidence as to how [he] had failed to cooperate in granting access" to LCDJFS. We view this argument somewhat distortive of the facts under consideration.

{¶62} The record demonstrates that Father did not comply with his case-plan goals regarding mental-health and substance-abuse assessments. We understand the word "access" is flexible. When caseworkers inquired, however, Father was unable to provide and was not forthcoming regarding his possible compliance. According to testimony, Father indicated he was essentially "working" on obtaining the assessments.

{¶63} Even if Father was "working" on the case-plan goals, he was deflective and unclear regarding what "work" he was doing. "Access," put commonly, is allowing information of a matter available. Father was not cooperative or transparent regarding his "work" on his case goals and did not offer any clear information about his "work" that would compel further inquiry.

{¶64} LCDJFS provides resources to assist people in achieving their case plan goals towards the end of reunification. The agency, however, is not a babysitter or a legal guardian of a parent that compels compliance of a parent who neglects or, perhaps, "stonewalls" efforts to reunify. While LCDJFS had obligations, Father did as well. Suffice it to say, his participation and level of commitment in this lengthy proceeding was less than adequate. We observe no problem in the trial court's determination that Father was not cooperative in granting "access" to his life, behaviors, or participation in any of the critical features of his case plan.

{¶65} Father was aware that the assessments were necessary to retaining custody of his children. He did not offer direct information to LCDJFS' agents to

Case Nos. 2025-L-064 and 2025-L-065

demonstrate meaningful compliance or motivation of his efforts. Father cannot blame this on LCDJFS. Moreover, Father was absent from any proceeding between late July 2023 and early August 2024. These points show that Father's acts or omissions, not LCDJFS caseworkers' acts or omissions, were at the core of the trial court's determination. We discern no error, and the trial court's determinations were consistent with the weight of the evidence.

{¶66} Regarding R.C. 2151.414(E)(4), the trial court determined that Father "was . . . unable to provide support for the minor child[ren] and missed numerous visitations." Father asserts that testimony from Ms. Priggins demonstrated that he provided B.M.H. with money via "cash apps." He also points to the alleged lack of LCDJFS' reasonable efforts made to allow consistent in-person contact with the children. Father finally asserts that he was "ready and willing" to provide an adequate, permanent home for the children.

{¶67} Initially, Father missed numerous visits with the children. And the record suggests his absence from visits may have been occasioned by his strange, hostile, or disruptive behavior. These points cannot be a basis for challenging LCDJFS' foundation for seeking and obtaining permanent custody. Alleged errors that are invited are problems that a party created. *See, e.g., Davis v. Wolfe*, 2001-Ohio-1281, ¶ 13 (the invited-error doctrine provides that "a party is not permitted to take advantage of an error that he himself invited").

{¶68} F.L.H.'s foster parents found Father's aggressive and standoffish behavior not only disconcerting but something that caused them to be concerned for their (or F.L.H.'s) safety. Similarly, Father's alleged intoxication, and eventual behavior at a visit

with F.L.H. at the agency demonstrated reasonable cause for concern to LCDJFS' agents.

{¶69} While Father may have a desire to care for the children, the record indicates he was not compliant with his case plan and engaged in actions or omissions that, under any metric, would be deemed worrisome. His housing was not adequate, his employment was not sufficient, and his interactions in this case with LCDJFS agents, as well as the children, were unusual, disruptive, and dismaying. The trial court did not err in concluding that, pursuant to R.C. 2151.414(E)(4), Father demonstrated a general lack of commitment to the children. This finding was therefore supported by sufficient, credible evidence.

{¶70} Finally, even if Father took issue with the best-interest factors enumerated in R.C. 2151.414(D)(1), his argument lacks merit. The trial court considered "the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child. . . ." R.C. 2151.414(D)(1)(a). The trial court also considered the wishes of the children, as expressed directly by them, with due regard for their maturity. R.C. 2151.414(D)(1)(b).

{¶71} In its judgment, the trial court determined:

> Mother could have visited most of the children weekly but because [B.M.H.] was only able to be transported to visits once a month Mother chose to come only once a month. [B.R.H.], [F.L.H.], and [C.A.H.] often do not wish to visit with mother and want to be adopted by their foster mothers, who are foster to adopt.
>
> [M.S.R.H.] is placed in a foster to adopt foster home and has not expressed a desire to be adopted. Although [M.S.R.H.] is bonded with Mother, [M.S.R.H.] has expressed frustration with [Mother] not getting a home where she can care for her

children first. [M.S.R.H.] appears realistic about Mother's inability to care for the children.

[M.J.H.], [C.L.H.], and [B.M.H.] have visits with Mother and appear bonded. The current wishes on being adopted is unclear but they likely would want to go home with Mother if Mother had a home for them to go to. The current foster mother for [M.J.H.] and [C.L.H.] is not currently foster to adopt but may take the necessary steps to become foster to adopt. The same foster mother intends on taking [B.M.H.] into her care once he complete[s] residential treatment in the near future.

{¶72} The court also emphasized that F.L.H. expressed multiple times that she does not want any contact with Father because she fears him. The court underscored that Father has not had any contact with his children in many months. Further, Father was banned from F.L.H.'s placement for inappropriate behavior, including harassing behavior and apparent intoxication revealed via testimony from the foster parents.

{¶73} The trial court considered the interaction and interrelationship with Mother and Father. One constant theme of the underlying proceedings, however, was LCDJFS' as well as the children's concerns for lack of stable housing. Dr. Mekota reiterated similar concerns as they pertain to Father. Additionally, as discussed above, Father demonstrated erratic and hostile behavior occasioned by perceived alcohol intoxication. Despite reasonable efforts, neither Mother nor Father was able to obtain housing and therefore failed to meet this fundamental case-plan goal. Further, Father never met his basic case-plan goals of achieving an updated dual mental health/substance abuse assessment.

{¶74} Viewed as a whole, we conclude the trial court adequately considered the R.C. 2151.414(D)(1)(a) and (b) factors.

{¶75} Next, R.C. 2151.414(D)(1)(c) provides, in relevant part, that a trial court must consider "[t]he custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period. . . ." Father had no obvious or meaningful custodial history with the children.

{¶76} Although Father suggests that LCDJFS made no efforts at reunification during the pendency of the motion for permanent custody, LCDJFS did not object to Mother's motion for a publicly paid custody evaluation, filed on October 18, 2024 (over two months after the motion for permanent custody was filed).

{¶77} The trial court granted Mother's motion and, as a result, set a trial date for April 2, 3, and 4, 2025. And, Father was interviewed by Dr. Mekota after the trial court granted Mother's motion. He was not specifically receptive to the doctor's interview.

{¶78} The trial court considered the custodial history and, in light of the evidence, did not ignore any crucial factors or nuances relating to the same.

{¶79} Finally, R.C. 2151.414(D)(1)(d) requires a court to assess the children's "need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency. . . ."

{¶80} The evidence supporting this factor is closely related to the evidence addressed under Father's first assignment of error; namely, the nature and extent of LCDJFS' reasonable efforts to prevent continued removal from Mother's or Father's home and reunify them with Mother or Father. As discussed throughout this opinion, a seminal issue in this matter was Mother's as well as Father's inability to acquire stable housing to accommodate the children. Mother concedes this was the primary feature of her case

Case Nos. 2025-L-064 and 2025-L-065

plan and the main barrier to reunification. And Father does not dispute his failure to directly comply with LCDJFS agents and/or his case plan was a causal premise for LCDJFS filing the motion for permanent custody of his children.

{¶81} Dr. Mekota voiced concerns about the stability of Father's housing as well as his employment.

{¶82} Further, we are aware that the GAL, Mr. Shryock, expressed some concern and disappointment about LCDJFS' efforts to accomplish reunification of the children. He asserted his belief that communication could have been "far better" between LCDJFS and Mother. Still, he was only able to speak with Mother at the courthouse because she did not respond to his other communications. Mr. Shryock met with Father at the courthouse and then again at Father's residence. The GAL offered no significant information regarding Father's relationship with his children. Still, Father's absences from proceedings and defiant conduct do not militate in his favor.

{¶83} Mr. Shryock emphasized his primary concern was Mother's inability to find housing for all of the children in conjunction with her inability to have regular employment. In light of the evidence, Mr. Shryock testified that he would recommend permanent custody to LCDJFS because "it is not in the children's best interests to be placed with a parent that does not have a residence, that does not have an appropriate residence."

{¶84} In its judgment entry, the trial court concluded that neither Mother nor Father demonstrated they are in a position to provide the children with a secure, permanent placement. The court also underscored that Mother has made little progress to secure any such housing.

Case Nos. 2025-L-064 and 2025-L-065

{¶85} Given the tumultuous and uncertain nature of Mother's and Father's living situation, in conjunction with Father's failure to clearly and convincingly adhere to his case-plan goals, we conclude that the trial court's best-interest analysis and adjudication is consistent with the manifest weight of the evidence.

{¶86} Father's second and third assigned errors lack merit.

{¶87} "Where the state institutes proceedings to force the permanent, involuntary termination of a parent's right in respect to their children, the parent is guaranteed effective assistance of counsel by the due process clauses of the United States and Ohio Constitutions." (Citations omitted.) *In re Ridenour*, 2005-Ohio-349, at ¶ 9 (11th Dist.).

{¶88} For his final assignment of error, Father alleges:

> Appellant was denied the effective assistance of counsel, in violation of Article I, Section 10 of the Ohio Constitution and the Sixth and Fourteenth Amendments, where trial counsel failed to investigate, obtain, and introduce treatment records bearing directly on the case plan goal (assessment and recommended substance-use treatment), thereby depriving appellant of a full and fair hearing and creating a reasonable probability of a different outcome.

{¶89} "There is a general presumption that trial counsel's conduct is within the broad range of professional assistance." *State v. Andrus*, 2020-Ohio-6810, ¶ 60 (11th Dist.), citing *State v. Bradley*, 42 Ohio St.3d 136, 142-143 (1989). The burden of establishing ineffective assistance of counsel falls upon the appealing defendant. *State v. Robinson*, 2021-Ohio-1064, ¶ 24 (11th Dist.)

{¶90} "In order to prevail on an ineffective assistance of counsel claim, an appellant must demonstrate that trial counsel's performance fell 'below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's

Case Nos. 2025-L-064 and 2025-L-065

performance.'" *Andrus* at ¶ 60, quoting *Bradley* at paragraph two of the syllabus (adopting the test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984)).

{¶91} Father asserts trial counsel's alleged failure to introduce treatment records bearing directly on the case-plan goals of obtaining substance-use treatment deprived him of effective assistance of counsel.

{¶92} Initially, the testimony demonstrated that, despite efforts to determine whether Father was compliant with obtaining substance-abuse assessments, he was unable to state that he obtained an "updated" assessment. Ms. Priggins testified that Father was required to have an *"updated mental health assessment and drug and alcohol assessment."* (Emphasis added.) No previous, let alone *updated*, assessment was referenced or brought to light at trial.

{¶93} Further, Father points out that, before the court, his trial counsel questioned Ms. Priggins regarding her awareness that "in the summer of 2024," Father checked himself into Elyria Mental Health as a VA (presumably as a Veteran's Administration) patient and also sought treatment for alcohol. Ms. Priggins was unsure.

{¶94} Nevertheless, counsel identified some modicum of compliance with the case-plan goals at issue. In this regard, it is difficult to discern how counsel's performance was deficient because he brought the information to the attention of the court regarding potential compliance with the case-plan goal of an "updated assessment." The information, however, does not imply Father received an "updated assessment." It stands to reason that a case-plan goal of an "updated assessment" is not the same or in any way equivalent to an individual's decision to "check in" to a clinic. No such information

regarding an "updated assessment" is available. To this extent, it is dehors the record and not a basis for finding counsel's performance deficient.

{¶95} Regardless of these points, various witnesses testified that Father had been drinking or was possibly intoxicated while interacting with individuals, including F.L.H. Moreover, Father did not attend many hearings, causing a warrant for his arrest to be issued. And, while Mother surrendered temporary custody, there was no evidence that Father ever sought custody of his children. Even if we found trial counsel's performance inadequate, which we do not, Father cannot demonstrate prejudice.

{¶96} Father's, not LCDJFS', acts or omissions resulted in this disposition. While we sympathize with parents subject to a termination of parental rights order, this court is confined to the record. The record in this case supports the trial court's judgment.

{¶97} Father's final assignment of error lacks merit.

{¶98} The judgments of the Lake County Court of Common Pleas, Juvenile Division, are affirmed.


MATT LYNCH, J.,

SCOTT LYNCH, J.,

concur.

Case Nos. 2025-L-064 and 2025-L-065

# JUDGMENT ENTRY

For the reasons stated in the opinion of this court, appellant's assignments of error lack merit. It is the judgment and order of this court that the judgments of the Lake County Court of Common Pleas, Juvenile Division, are affirmed.

Costs to be taxed against appellant, Ethann Putman.

_____
JUDGE EUGENE A. LUCCI

_____
JUDGE MATT LYNCH,
concurs

_____
JUDGE SCOTT LYNCH,
concurs

**THIS DOCUMENT CONSTITUTES A FINAL JUDGMENT ENTRY**

A certified copy of this opinion and judgment entry shall constitute the mandate pursuant to Rule 27 of the Ohio Rules of Appellate Procedure.

Case Nos. 2025-L-064 and 2025-L-065