[Cite as *In re L.W.*, 2025-Ohio-2236.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | |
| | | No. 23AP-690 |
| L.W., | : | (C.P.C. No. 21JU-2395) |
| [V.P., Mother, | : | (REGULAR CALENDAR) |
| Appellant]. | : | |

D E C I S I O N

Rendered on June 26, 2026

**On brief:** [*Mitchell A. Williams*], Franklin County Public
Defender, and *Leon J. Sinoff*, for appellant.

**On brief:** *Robert J. McClaren* and *Jessica Ismond*, for
Franklin County Children Services.

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations and Juvenile Branch

BOGGS, J.

{¶ 1} Appellant, V.P., appeals the judgment of the Franklin County Court of
Common Pleas, Division of Domestic Relations and Juvenile Branch, granting appellee,
Franklin County Children Services ("FCCS"), permanent custody of appellant's minor child,
L.W. For the following reasons, we affirm the juvenile court's judgment.

## I.  PROCEDURAL HISTORY AND FACTS

{¶ 2} V.P. is the mother of L.W., who was born on December 9, 2019, and J.K., born
on January 17, 2018. T.W. is the father of L.W., and C.K. is the father of J.K.

{¶ 3} On March 8, 2021, FCCS filed a complaint alleging that L.W. appeared to be
an abused, neglected, and dependent child.[1] The complaint stated that on February 4, 2021,
FCCS received a report that V.P. had overdosed and an ambulance was called to the home.

---

[1] J.K.'s custody was determined in another proceeding.

In the complaint, FCCS alleged that this was posted on Facebook, and V.P. had been posting online that she believed she was depressed and she wished she was dead. FCCS was concerned that V.P. was addicted to substances and that the overdose incident may have been a suicide attempt. *Id.* The FCCS complaint also raised concerns that J.K. had been left alone in the home and that the children had been left with V.P.'s sister, who is developmentally disabled. The complaint also noted that the children had been briefly removed from the home in 2020 over concerns of V.P.'s substance abuse and that the agency was concerned about domestic violence in the home.

{¶ 4} On March 15, 2021, L.W. was placed into FCCS custody under a temporary custody order and was appointed a guardian ad litem ("GAL"), Kelley Boller. In her first report, dated May 12, 2021, Boller noted that L.W. was born drug-positive, and a separate complaint, which was later dismissed, had been filed in January 2020, shortly after L.W. was born. Boller's report also expressed concerns about V.P. leaving L.W. with inadequate supervision and being in a series of relationships with domestic violence, as well as mental health concerns with V.P. self-harming, having suicidal ideations, and previously exhibiting self-harming behavior, including punching herself repeatedly when she was in labor with L.W. Boller's report also noted that V.P. has shared video on social media of her using drugs in the presence of L.W. and J.K.

{¶ 5} On May 13, 2021, a magistrate with the juvenile court found that L.W. was a dependent minor and placed her in the temporary court commitment of FCCS. (June 9, 2021 Mag.'s Decision.) V.P. was given a case plan that directed her to complete the following action steps: provide proof of a legal source of income and stable housing, complete ongoing drug screens, complete a mental health assessment and an alcohol and/or drug ("AOD") assessment and comply with subsequent recommendations, and have no more reports of domestic violence in the home.

{¶ 6} On July 6, 2022, FCCS filed a motion for permanent custody of L.W. In its motion, FCCS argued that it was in the best interest of L.W. to award permanent custody to the agency. FCCS stated that "[t]his family has a history with child protective services dating back to 2018 and related to mother and father's untreated mental health issues, substance use disorder, domestic violence, unsanitary home conditions and poor parenting practices." (July 6, 2022 Franklin Cty. Children Servs.' Mot. for Permanent Custody at 4.)

FCCS argued that L.W. is doing well with her foster family and all her needs are being met in the home. FCCS also stated that V.P. and T.W. had failed to meet their case plan objectives and subsequent recommendations to address mental health, domestic violence, and substance abuse issues.

{¶ 7} On August 31 and September 1, 2023, the trial court held a hearing on FCCS's motion for permanent custody. The trial court heard testimony from V.P., FCCS Caseworker Davica Goodlett, L.W.'s GAL, Private Investigator Stephanie Fike, and L.W.'s foster mom, S.W.

{¶ 8} In her testimony, V.P. stated that she had a history of depression, anxiety, and post-traumatic stress disorder, and that she completed a mental health assessment and an AOD assessment. V.P. also stated that her assessments recommended she engage in mental health counseling and that she completed counseling at Southeast. V.P. testified that in early 2023, she took steps to return to counseling, as she was having issues with depression. V.P. also stated that she sought treatment for depression in 2020 after there was domestic violence between herself and her partner.

{¶ 9} V.P. testified that she completed an AOD assessment in August 2022. She stated that she completed some drug screens but did not begin those for several months after FCCS removed L.W. and J.K. from the home. V.P. acknowledged that she tested positive for THC in all her drug screens but stated that she has a medical marijuana license. V.P. testified that she tested positive for alcohol in April 2023, at the same time she was charged with OVI and later for falsification of a police report. V.P testified at the hearing that her driver's license was suspended but that she drove to court that day. V.P. testified that she started drinking alcohol when she was 16 years old, that she began drinking more heavily when this case first opened, and eventually she was drinking a gallon of crown apple whiskey every day. She stated that she quit drinking after she got into the accident related to her OVI charge. She testified that she waited to do the AOD assessment because she knew she had a drinking problem, was attempting to keep that information from FCCS, and that she has a history of hiding information from FCCS. V.P. testified that she has not sought out additional AOD treatment since her accident as she thought it was unnecessary.

{¶ 10} V.P. also testified that, since the case had been opened, there have been additional incidents of domestic violence involving a boyfriend, R.G., with police being

called to her home from the fall of 2022 into February of 2023. V.P. testified that she cut off contact with R.G. in February of 2023. V.P. testified that she had been in several previous relationships with domestic violence and that L.W. and J.K. have been around domestic violence in the home. V.P. stated that she received counseling and completed an hour-long, online healthy relationship workshop. V.P. testified that she had unsupervised visits with L.W. until FCCS again required supervision due to concerns with domestic violence. V.P. also testified that she is renting a house and is employed at a warehouse.

{¶ 11} The trial court also heard testimony from Davica Goodlett, a FCCS caseworker. Goodlett testified that the overarching issues that led to L.W.'s removal from V.P.'s care were substance abuse, domestic violence, and mental health concerns. Goodlett stated that L.W.'s father, T.W., has not completed any objectives in his case plan, besides establishing paternity, and that it has been over 90 days since he has seen L.W.

{¶ 12} Goodlett testified that FCCS had expressed concerns with V.P. being in ongoing relationships that involved domestic violence while L.W. was present. Goodlett also stated that FCCS was concerned with V.P.'s mental health, since it appeared that she attempted suicide at the beginning of the case, after she and her boyfriend broke up. Goodlett testified that V.P.'s mental health assessment included diagnoses of alcohol use disorder, anxiety disorder, major depression disorder, and post-traumatic stress disorder . Goodlett testified that she does not think V.P.'s substance abuse, mental health, and domestic violence issues have been adequately addressed. Goodlett stated that she has not been able to verify V.P.'s treatment through counselors and does not have documentation confirming V.P.'s mental health treatment. Goodlett also expressed concerns about V.P.'s marijuana use being outside the parameters of her medical marijuana license, and that V.P. just takes however much she needs to calm down and is vague about her usage. Goodlett testified that overall, V.P. has been compliant with drug screening, completing 100 drug screens and missing 87. Goodlett stated that V.P. has always tested positive for marijuana and has had several positive tests for alcohol.

{¶ 13} Goodlett also stated in her testimony that she is concerned about domestic violence, as the police had been called to V.P.'s address three times in February 2023. Goodlett testified that she was concerned about V.P.'s relationship with R.G. at times becoming violent, and at the time of trial, Goodlett believed V.P. was still in a relationship

with R.G. Goodlett thought she saw R.G. in V.P.'s vehicle in August of 2023. Goodlett confirmed that, while V.P. did complete a one-hour domestic violence class, FCCS is looking for her to do a more intensive program.

{¶ 14} Goodlett also testified that she was concerned about V.P.'s mental health and that she still struggles with depression and anxiety, and that V.P. needs to see a counselor. Goodlett stated that she believed V.P. still has ongoing alcohol and drug issues, referencing a drunk driving incident in April 2023 and a positive alcohol drug screen at that time.

{¶ 15} Goodlett confirmed that V.P. has maintained stable housing and employment. Goodlett also stated that V.P. regularly attends visitation with L.W., that V.P. is good and attentive with L.W., and that V.P. and L.W. have a bond, with L.W. calling V.P. "mom." Goodlett, however, stated that she did not believe V.P. sufficiently resolved the concerns that led to the case opening:

> [t]he concerns are still that there's . . . domestic violence going on at home. There's still concerns with the substance abuse. And even though mom is, you know, completed a mental health assessment, again, she isn't really - - she hasn't really been going to a counselor weekly, monthly . . .

(Aug. 31, 2023 Tr. at 176.)

{¶ 16} Goodlett recommended the court grant FCCS permanent custody for the purpose of adoption and that L.W.'s current foster home was a potential adoptive home.

{¶ 17} The trial court also heard testimony from Boller. Boller stated that there was a strong bond between L.W. and her foster mom, and that they had a mother-daughter like relationship. Boller stated that there was also a bond between V.P. and L.W. Boller stated that L.W. wants to stay with her foster mom. Boller also expressed concerns about L.W. being returned to V.P.'s care:

> Unfortunately, I have extreme concerns about domestic violence in [V.P.]'s life. So, I - - it - - it's the same things. I would just echo everything that's already been said. I have extreme concerns about domestic violence in . . . [V.P.'s] life. Both with her as an aggressor as well as a victim. I have concerns about her substance abuse. I have concerns about her mental health. And I believe all of those things are intertwined.

 (Aug. 31, 2023 Tr. at 232.)

{¶ 18} Boller also expressed concerns that V.P. was drug screening sporadically, with significant gaps in time where she was not screening at all. Boller also testified that she was concerned about V.P.'s marijuana usage as a crutch for her mental health issues, and that it may have spurred the OVI incident in April 2023. Boller also stated that she was concerned about domestic violence still being present and L.W. being exposed to it. Boller testified that V.P. told her that counseling does not work to address domestic violence and that she did not want to do it again. Boller also noted that V.P. has been the aggressor in domestic violence situations, and that V.P. does not seem to take responsibility for vetting people before allowing them around her children. Boller also believed V.P. was being dishonest with her and FCCS, and that V.P. is still in a relationship with a previous boyfriend in which there was domestic violence.

{¶ 19} Boller testified that V.P. regularly attended visits with L.W. Boller stated that V.P. actively played with L.W. and brought toys and food for L.W. Boller also testified that, with V.P., it was one step forward, two steps back—when V.P. finally consistently completed drug testing, she would then lie about her relationship status and the existence of domestic violence. Boller was concerned that V.P. waited one full year to start working on her case plan. Ultimately, Boller recommended that permanent custody to FCCS be granted.

{¶ 20} The trial court then heard testimony from Stephanie Fike, called on behalf of L.W.'s foster mom, S.W. Fike testified that she is a private investigator, who completed surveillance of V.P.'s home, used a tracking device on R.G.'s car, conducted social media searches, and requested public records regarding V.P. from law enforcement. Fike testified that she identified R.G.'s car and that it was at V.P.'s home almost every night and at times during the day. She testified that she saw R.G. and V.P. both driving the car and that what she believed to be R.G.'s dog was frequently at V.P.'s home. Fike testified that she last observed R.G. and his dog at V.P.'s home on June 21, 2023, shortly before Fike ended her surveillance.

{¶ 21} Finally, the trial court heard from S.W., the foster mom for L.W. S.W. stated that, at the time of trial, L.W. had been placed in her home for the past two and one-half years. S.W. stated that L.W. is current on her medical appointments and attends a preschool daycare program. S.W. testified that if the trial court granted permanent custody, it would be her intention to adopt L.W.

{¶ 22} On October 26, 2023, the trial court issued a judgment entry granting FCCS permanent custody of L.W. The trial court found that L.W.

> was in the continuous custody of [FCCS] for purposes of R.C. 2151.414(B)(1)(d), from the May 31, 2021, adjudicatory and dispositional hearings, to the date of the July 6, 2022, filing of the motion for permanent custody a period of over 12 months.
>
> The Court concludes, therefore, that [FCCS] met its burden of proof and need not provide any additional evidence as to the First Part of the permanent custody test.

(Emphasis deleted.) (Oct. 26, 2023 Jgmt. Entry Granting Permanent Custody at 11.)

{¶ 23} The trial court also found that L.W. could not be placed with either parent within a reasonable time, as the parents failed to substantially remedy the conditions causing L.W. to be placed outside her home, and that T.W. abandoned L.W. *Id.* The trial court found that all four circumstances set forth in R.C. 2151.414(D)(2)(a) through (d)[2] were proven by clear and convincing evidence. The trial court further stated that it was therefore required to find that termination of parental rights is in the best interest of L.W. Additionally, the trial court found that having considered the five best interest factors set out in R.C. 2151.414(D)(1), FCCS's "motion for permanent custody is in the best interest of [L.W.]" *Id.* at 13. It stated, "The best option for [L.W.] . . . to have a full life is that she be adopted, and that granting the motion for permanent custody is in her best interest." *Id.*

{¶ 24} V.P. now appeals the trial court's judgment granting FCCS permanent custody of L.W.

## II. ASSIGNMENTS OF ERROR

{¶ 25} V.P. argues the following assignments of error:

---

[2] R.C. 2151.414(D)(2)(a) through (d) states:
(2) If all of the following apply, permanent custody is in the best interest of the child, and the court shall commit the child to the permanent custody of a public children services agency or private child placing agency:
(a) The court determines by clear and convincing evidence that one or more of the factors in division (E) of this section exist and the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent.
(b) The child has been in an agency's custody for two years or longer, and no longer qualifies for temporary custody pursuant to division (D) of section 2151.415 of the Revised Code.
(c) The child does not meet the requirements for a planned permanent living arrangement pursuant to division (A)(5) of section 2151.353 of the Revised Code.
(d) Prior to the dispositional hearing, no relative or other interested person has filed, or has been identified in, a motion for legal custody of the child.

[1.] The Juvenile Court's Decision Permanently Terminating Mother V.P.'s Parental Rights, and Granting Permanent Custody of L.W. to Franklin County Children's Services, Was Not Support[ed] by Sufficient Evidence and Was Contrary to the Manifest Weight of the Evidence.

[2.] The Juvenile Court Failed to Comply with Federal Law, and Undermined the System of Concurrent Jurisdiction Between State Courts and Indian Tribal Courts, When It Failed to Conduct the Proper Indian Child Welfare Act (ICWA) Inquiry Prior to a Permanent Child Custody Determination.

## III. ANALYSIS

{¶ 26} "The right to parent one's child is a fundamental right protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 16, of the Ohio Constitution." *In re L.W.*, 2018-Ohio-2099, ¶ 6 (10th Dist.). *See also In re Murray*, 52 Ohio St.3d 155, 157 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) ("[T]he right to raise one's children is an 'essential' and 'basic civil right.' "). "Parents have a 'fundamental liberty interest' in the care, custody, and management of the child." *Id.*, quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). "Permanent termination of parental rights has been described as 'the family law equivalent of the death penalty in a criminal case.' . . . Therefore, parents 'must be afforded every procedural and substantive protection the law allows.' " *In re Hayes*, 79 Ohio St.3d 46, 48 (1997), quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist. 1991).

{¶ 27} However, the right of a parent to raise their own child is not absolute and is subject to the ultimate welfare of the child. *In re Matter of C.W.*, 2025-Ohio-282, ¶ 35 (10th Dist.), citing *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979). In certain circumstances, therefore, the state may terminate the parental rights of natural parents when such termination is in the child's best interest. *C.W.* at ¶ 35, citing *Cunningham* at 105. The state has broad authority to intervene to protect children from abuse and neglect. *In re C.F.*, 2007-Ohio-1104, ¶ 28, citing R.C. 2151.01. An award of permanent custody, which terminates parental rights, is an " 'alternative of last resort and is only justified when it is necessary for the welfare of the children.' " *In re C.G.*, 2014-Ohio-279, ¶ 28 (10th Dist.), quoting *In re Swisher*, 2003-Ohio-5446, ¶ 26 (10th Dist.).

**A. Assignment of Error No. 1**

{¶ 28} In her first assignment of error, V.P. argues that the trial court's decision awarding permanent custody to FCCS was not supported by sufficient evidence and was against the manifest weight of the evidence.

{¶ 29} In Ohio, the termination of parental rights is governed by R.C. 2151.414. Under R.C. 2151.414(B)(1), a juvenile court may grant permanent custody of a child to a children services agency if the court determines by clear and convincing evidence that: (1) one of five factors enumerated in R.C. 2151.414(B)(1)(a) through (e) applies; and (2) it is in the best interest of the child to do so. *In re Z.C.*, 2023-Ohio-4703, ¶ 7. "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 30} "[T]he proper appellate standards of review to apply in cases involving a juvenile court's decision under R.C. 2151.414 to award permanent custody of a child and to terminate parental rights are the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards, as appropriate depending on the nature of the arguments that are presented by the parties." *Z.C.* at ¶ 18. The sufficiency-of-the-evidence standard tests the adequacy of the evidence; a court of appeals should affirm a trial court when the evidence, if believed, is legally sufficient to support the verdict as a matter of law. *Id.* at ¶ 13; *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). The manifest-weight-of-the-evidence standard concerns the effect of the evidence in inducing belief. *Z.C.* at ¶ 13; *Thompkins* at 387. "When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Z.C.* at ¶ 14, citing *Eastley v. Volkman,* 2012-Ohio-2179, ¶ 20. " 'In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact.' " *Id.* at ¶ 14, quoting *Eastley* at ¶ 21.

{¶ 31} We note that V.P. does not dispute that L.W. has been in the temporary custody of FCCS for 12 or more months of a consecutive 22-month period, or that either R.C. 2151.414(B)(1)(a) or 2151.414(B)(1)(d) is satisfied. Therefore, our review turns to whether the trial court's decision to grant permanent custody to FCCS is in the best interest of the child under the required analysis within R.C. 2151.414(D).

{¶ 32} V.P. argues the trial court erred in not explaining how it weighed the five best interest factors under R.C. 2141.414(D)(1). However, an appellate court can review the record to determine whether the evidence supports the trial court's decision. *In re C.W.*, 2024-Ohio-4987 (1st Dist.). "In reviewing a judgment granting permanent custody to FCCS, an appellate court 'must make every reasonable presumption in favor of the judgment and the trial court's findings of facts.' " *In re J.T.*, 2012-Ohio-2818, ¶ 8 (10th Dist.), quoting *In re P.G.*, 2012-Ohio-469, ¶ 37 (10th Dist.).

{¶ 33} Our review of the record indicates that the trial court's decision was supported in the record by sufficient evidence and was not against the manifest weight of the evidence. As discussed in the trial court's decision and supported by the GAL and FCCS caseworker's testimony, V.P. did not adequately address the conditions that led to L.W. being removed from the home. While the trial court noted that V.P. was attentive to L.W. and the two were bonded, V.P. ultimately did not meet her case plan objectives regarding her alcohol and drug abuse, mental health, and domestic violence concerns.

{¶ 34} While V.P. completed an AOD assessment, she missed a substantial number of drug screens, with significant gaps in between drug screenings. V.P. was also charged with OVI and falsification, in violation of R.C. 4511.19(A)(1) and R.C. 2921.13(A)(3), in April 2023, which was still pending at the time of the hearing on the motion for permanent custody. V.P. also testified that she was drinking heavily during the pendency of the proceedings, particularly when she failed to complete drug screens, including up to a gallon of crown apple whiskey every day.

{¶ 35} V.P. also has a history of anxiety, depression, and post-traumatic stress disorder. FCCS and the GAL were concerned that V.P.'s overdose incident, which led to L.W. being removed from the home, was a possible suicide attempt, albeit which V.P. denies. While V.P. testified that she completed an assessment and counseling, the FCCS

caseworker testified that she could not confirm V.P. attended and completed treatment by mental health professionals.

{¶ 36} V.P. also testified that she had been in several relationships marked by domestic violence, including with the fathers of both J.K. and L.W. V.P. testified at trial that she completed a one-hour Zoom class on domestic violence. However, the FCCS caseworker believed V.P. was still in a relationship with R.G., despite V.P. claiming the relationship ended in February 2023. V.P. and R.G. had several incidents of domestic violence, with police being called to V.P.'s home in December 2022 and in February 2023. While V.P. claimed the relationship had ended, the testimony of Stephanie Fike indicates that V.P. remained in contact with R.G. until at least June 2023. The FCCS caseworker also testified that she believed she saw R.G. in the back seat of V.P.'s car in August 2023, which again, V.P. denied. The GAL also believed that R.G. was providing transportation for V.P. as recently as June 2023.

{¶ 37} Even though V.P. made significant progress on several aspects of her case plan related to securing housing and employment, and the evidence shows that L.W. has bonded with her, the concerning aspects of domestic violence, substance abuse, and mental health continued to be issues at the time of trial. We accordingly cannot find that the trial court so lost its way and created such a manifest miscarriage of justice, nor do we find that the trial court's determination of L.W.'s best interest lacked sufficient evidence.

{¶ 38} L.W., now 5 years old, has been in foster care since she was 15 months old, as she was removed from the home on March 15, 2021. FCCS filed for permanent custody in 2022, but the trial did not take place until September 2023. While V.P. was able to maintain stable housing and income, in accordance with her case plan, she did not begin to address the substance abuse, mental health, and domestic violence concerns until August 2022, a month after FCCS filed its motion for permanent custody. As FCCS noted, V.P. made some progress in her case plan but was ultimately not able to adequately address these concerns that led to L.W.'s removal in March 2021.

{¶ 39} Therefore, we overrule V.P.'s first assignment of error.

**B. Assignment of Error No. 2**

{¶ 40} In her second assignment of error, V.P. argues that the trial court erred in not conducting an Indian Child Welfare Act ("ICWA") inquiry prior to its permanent child custody determination. We do not agree.

{¶ 41} Congress passed ICWA in 1978 in order to address the "alarmingly high percentage of Indian families [that] are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies" and to address the placement of an "alarmingly high percentage of such children . . . in non-Indian foster and adoptive homes." 25 U.S.C. 1901(4). ICWA provides a procedure for state courts to determine whether ICWA applies:

> State courts must ask each participant in an emergency or voluntary or involuntary child-custody proceeding whether the participant knows or has reason to know that the child is an Indian child. The inquiry is made at the commencement of the proceeding and all responses should be on the record. State courts must instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child.

25 C.F.R. 23.107(a).

{¶ 42} V.P. directs us to this court's prior statements that " '[t]he importance of a proper ICWA inquiry cannot be overstated' because the failure to comply with its notice provisions may result in invalidation of the juvenile court's custody determination under 25 U.S.C. 1914." *In re A.G.*, 2024-Ohio-2136, ¶ 44 (10th Dist.), quoting *In re D.E.*, 2021-Ohio-524, ¶ 61 (10th Dist.). *See also* Adm.Code 5180:2-53-02(A) ("Failure to identify Indian children can nullify court proceedings that have not been conducted in accordance with ICWA."). V.P. argues that the trial court did not make any ICWA inquiry and, thus, did not comply with the federal law, which warrants reversal.

{¶ 43} However, V.P. did not raise this issue in the trial court. We note that other courts of appeals have analyzed this question under a plain-error standard of review on appeal. *See In re S.M.*, 2025-Ohio-34, ¶ 15 (9th Dist.); *In re K.Y.*, 2025-Ohio-1117, ¶ 35 (5th Dist.); *In re L.T.*, 2025-Ohio-1719, ¶ 15 (5th Dist.). The Fifth District Court of Appeals, in reviewing an appeal of a judgment granting a permanent custody motion where an ICWA inquiry was not completed, stated:

> Civil plain error is to be recognized only in the exceptional case in which the error "seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 1997- Ohio 401, 679 N.E.2d 1099 (1997), syllabus. In applying the doctrine, reviewing courts "must proceed with the utmost caution, limiting the doctrine strictly to those extremely rare cases where exceptional circumstances require its application to prevent a manifest miscarriage of justice, and where the error complained of, if left uncorrected, would have a material adverse effect on the character of, and public confidence in, judicial proceedings." *Id.* at 121.

*L.T.* at ¶ 15.

**{¶ 44}** As V.P. did not raise this issue in the trial court, we similarly review her second assignment of error for plain error and find none.

**{¶ 45}** It is notable that V.P. did not argue, either at the trial court or on appeal, that she or L.W. possesses any Native American heritage. In both *D.E.* and *A.G.*, appellant-parents were asked about potential Native American background and responded inconclusively. In *D.E.*, the mother was asked about potential Native American background at the temporary custody hearing and she indicated that she had Cherokee heritage, but she later answered the question in the negative at the permanent custody hearing. *D.E.* at ¶ 56-59. In *A.G.*, the appellant-parent replied "I don't think so" as to whether she had any Native American background. *A.G.* at ¶ 3. In *In re J.B.*, 2018-Ohio-1201, ¶ 19 (8th Dist.), the court stated:

> This court has held that the party asserting the applicability of the ICWA bears the burden of proving that a child meets the statutory definition of an "Indian child." *In re C.C.*[, 2010-Ohio-780,] at ¶ 4 [(8th Dist.)]. In order to meet this burden, the party asserting the applicability of the ICWA must do more than raise the possibility that a child has [N]ative American ancestry. *Id.*, citing *In re B.S.*, 184 Ohio App. 3d 463, 2009-Ohio-5497, at ¶ 63, 921 N.E.2d 320.

**{¶ 46}** Since there is no indication from V.P. that either she or L.W. has Native American heritage, we cannot find the lack of an ICWA inquiry caused a manifest miscarriage of justice or had a material, adverse effect on the proceedings.

**{¶ 47}** Accordingly, we overrule V.P.'s second assignment of error.

## IV.  CONCLUSION

{¶ 48}  Having overruled both of V.P.'s assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations and Juvenile Branch.

*Judgment affirmed.*

MENTEL and DINGUS, JJ., concur.

———————————