[Cite as *In re T.T.*, 2026-Ohio-710.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## LAKE COUNTY

IN THE MATTER OF:

T.T., DEPENDENT CHILD AND

V.T., ABUSED AND DEPENDENT CHILD

CASE NOS. 2025-L-103
2025-L-104

Civil Appeals from the
Court of Common Pleas,
Juvenile Division

Trial Court Nos. 2024 DP 00532
2023 AB 00826

---

## OPINION AND JUDGMENT ENTRY

Decided: March 2, 2026
Judgment: Affirmed

---

*Christopher J. Boeman*, Lake County Department of Job & Family Services, 177 Main Street, Painesville, OH 44077 (For Appellee, Lake County Department of Job & Family Services).

*Judith M. Kowalski*, 333 Babbitt Road, Suite 323, Euclid, OH 44123 (For Appellant, E.T.).

*Mandy J. Gwirtz*, 20050 Lakeshore Boulevard, Euclid, OH 44123 (Guardian ad Litem).

*Susan T. Seacrist*, Seacrist Law Office, L.L.C., 7445 Center Street, Mentor, OH 44060 (Guardian ad Litem).

MATT LYNCH, P.J.

{¶1} Appellant, E.T. ("Mother"), appeals the judgments of the Lake County Court of Common Pleas, Juvenile Division, terminating her parental rights and granting permanent custody of her minor daughters, V.T. and T.T., to the Lake County Department of Job and Family Services ("LCDJFS"). For the following reasons, we affirm the trial court's judgments.

{¶2} On August 15, 2023, LCDJFS filed a complaint for temporary custody of V.T., alleging she was an abused and dependent child. LCDJFS further alleged that in June 2023, V.T. was born prematurely at 27 weeks of gestation and tested positive for morphine. Mother was not administered any morphine by the hospital. V.T. remained in the neonatal intensive care unit at Rainbow Babies & Children's Hospital because of her medical complications, including the loss of a functioning kidney. V.T. needed a caregiver who could provide human touch and interaction on a frequent basis. Mother was not regularly visiting V.T. and would not allow other family members to visit. Mother used methamphetamine during her pregnancy and presented as paranoid and delusional with confused and disorganized thoughts. LCDJFS contacted V.T.'s maternal grandmother, who had been given legal custody of Mother's older daughter, R.T., now emancipated, but the grandmother was not in a position to care for V.T. Mother could not provide any information on other family or kin, and she could not identify V.T.'s father. LCDJFS was concerned with Mother's mental health, her substance abuse during pregnancy, and V.T.'s current need for human contact and care.

{¶3} The trial court granted temporary custody of V.T. to LCDJFS at a 72-hour hearing. Mother did not appear. A family case plan was formulated and adopted by the trial court. In October 2023, the trial court adjudicated V.T. abused and dependent, and extended temporary custody to LCDJFS. Mother failed to appear for the hearing. LCDJFS placed V.T. with a foster parent who could care for V.T.'s specific needs.

{¶4} Thereafter, the trial court held review hearings, and LCDJFS filed a semi-annual review plan, which the trial court adopted. Mother failed to appear for any of the hearings.

Case Nos. 2025-L-103, 2025-L-104

{¶5} On June 11, 2024, following the birth of Mother's third daughter, T.T., LCDJFS filed a second complaint alleging T.T. is a dependent child and requesting temporary custody. LCDJFS alleged that on January 25, 2024, Mother was admitted to Hillcrest Hospital for psychiatric treatment. Prior to her admission, Signature Health requested Mother be appointed a guardian ad litem because of Mother's mental health issues. At that time, Mother had been staying at various locations in Lake County, Ohio, including a motel.

{¶6} In February 2024, at Akron General Hospital where Mother had been transferred for psychiatric treatment, Mother gave birth to T.T. T.T. was born prematurely at 27 weeks gestation with severe medical issues that caused her to be placed on oxygen. T.T. weighed 1.6 pounds. She was described as "very irritable" and required occupational, speech, and physical therapy. The hospital reported its concerns to LCDJFS because Mother would not participate or listen when staff tried to explain T.T.'s needs. On October 29, 2024, Mother was released from the hospital. She alternated for two-week periods between living in a motel and staying in the hospital with T.T.

{¶7} The trial court granted LCDJFS temporary custody of T.T. at a 72-hour hearing. Mother did not attend. An updated case plan including both children was adopted by the trial court. In April 2024, the trial court appointed Mother a guardian ad litem, and in July 2024, upon Mother's application, the trial court appointed Mother counsel. On August 28, 2024, the trial court held a dispositional hearing for T.T., which Mother did not attend. Mother's counsel attended but did not present any evidence. The trial court adjudicated T.T. a dependent child and extended temporary custody to LCDJFS. LCDJFS placed T.T. in a therapeutic foster home.

Case Nos. 2025-L-103, 2025-L-104

{¶8}   As relevant to the instant appeal, an inquiry into the children's possible Indian or Native American Ancestry appears to have been conducted and is marked as "No" in the February 2024, August 2024, and July 2025 semi-annual review reports filed by LCDJFS.

**Motions for Permanent Custody**

{¶9}   On February 6, 2025, LCDJFS filed a motion for permanent custody of V.T., pursuant to R.C. 2151.413, 2151.414, 2151.415, and 2151.419, alleging V.T. has been in the temporary custody of LCDJFS for 12 or more consecutive months out of a 22-month period.

{¶10}  On the same day, LCDJFS filed a motion for permanent custody of T.T., pursuant to R.C. 2151.353(A) and 2151.414(E), alleging T.T. has been in the temporary custody of LCDJFS for seven months, it has been five months since she was adjudicated dependent, and she cannot be placed with either parent within a reasonable period of time and/or should not be placed with either parent.

**Permanent Custody Hearing**

{¶11}  The permanent custody hearing was set for April 2025; however, after Mother failed to appear, the trial court continued the hearing to July 10, 2025.

{¶12}  At the one-day permanent custody hearing for both children, LCDJFS introduced several witnesses:  T.T.'s foster father, B.G.; V.T.'s foster mother, J.W.; and LCDJFS social worker Joy Biggs.  LCDJFS also entered into evidence court records of R.T.'s custody case.  Prior to the hearing, Mother's counsel notified the court Mother might have to leave early because she was not feeling well and possibly had a transportation issue.  Mother did leave during Biggs' testimony after informing the court

that her bus was arriving. Mother's counsel did not present any evidence or testimony at the hearing.

{¶13} B.G. and his wife are T.T.'s foster parents. At the time of the hearing, they had an eight-year-old daughter and a son who was born the day before the hearing. T.T. was placed with them when she left the hospital, approximately 13 months prior. T.T. was 17 months old at the time of the hearing. B.G. described T.T. as "laid back" and "calm." He noted she is behind on her growth curve for children her age and she is very small. When T.T. was first released from the hospital's neonatal intensive care unit into their care, she was on continuous oxygen. They had oxygen compressors in their home and portable oxygen tanks. For the first six months, T.T. had at least one medical appointment a week. T.T. had surgery on her lungs and aorta in December 2024, and one month later she no longer required continuous oxygen. B.G. explained T.T. uses a daily inhaler and is on a protein supplement.

{¶14} B.G. further testified he believes T.T. is well adjusted with B.G.'s daughter and the family's companion animals. T.T. has weekly visits with Mother and V.T. and occasionally has play dates with V.T. Mother gave T.T. gifts around the holidays and her birthday. While B.G. and his family cannot permanently adopt T.T., they are willing to care for her until a new foster family is found. At the time of the hearing, they had just met with a potential foster family who was interested in adopting her.

{¶15} J.W. testified that V.T. was unofficially placed with her on August 15, 2023, and officially placed with her on September 22, 2023, when V.T. was released from the hospital. After receiving the call on August 15, J.W. began visiting V.T. at the hospital every day. J.W. described V.T. as "wonderful," "really active, pleasant," and "very observant." V.T. continues to have medical issues from her premature birth, including

problems with her eyes, kidneys, and speech. V.T. is also in the lower percentile for height and weight. J.W. described V.T. as "consistently sick since being released from the hospital," which often requires emergency hospital care for breathing assistance. J.W. and V.T. visit J.W.'s family every Sunday, and V.T. has friends and a best friend in day care. J.W. would like to adopt V.T. J.W. was willing to also foster T.T., however, T.T. is unable to attend day care and J.W. is a single, working parent. V.T. has been visiting with Mother and T.T. once a week. J.W. is open to V.T. having a relationship with T.T. and tries to schedule a visit for T.T. and V.T. once a month. J.W. sends Mother updates on V.T., to which Mother sometimes responds. J.W. is willing to continue to share updates via email with Mother if LCDJFS is granted permanent custody.

{¶16} Biggs, the LCDJFS social worker for the family, testified the father(s) remain unidentified and Mother could not provide any identifying information. Mother reported the children have the same father, and although she can recognize him, he is a "shapeshifter" who looks different every time she sees him. Mother described a "shapeshifter" as a person who can change physical characteristics, including appearance and size. Biggs was also Mother's case worker 15 years ago when Mother voluntarily relinquished custody of R.T. to LCDJFS. Legal custody of R.T. was eventually granted to R.T.'s maternal grandmother. At that time, Mother had a history of mental illness and non-compliance with medications, and she could not provide adequate parental care for R.T. Biggs opined that Mother's issues are substantially the same now as those she encountered while working on R.T.'s case.

{¶17} Biggs further testified LCDJFS became involved with V.T. when Mother began exhibiting aggressive behaviors in the hospital. V.T. has bonded with her foster mother. LCDJFS became similarly involved in T.T.'s case when the hospital grew

concerned about T.T.'s care and Mother's ability to meet T.T.'s needs. LCDJFS contacted known family members before placing T.T. with her current foster family. T.T.'s foster parents had training by professionals who taught them how to hold T.T. before she was released from the hospital.

{¶18} Biggs also testified as to Mother's progress on the case plan. Mother completed a drug and alcohol assessment at Signature Health. She tested negative and was recommended individual counseling for dual diagnosis, which she has attended. Mother is not screened frequently for drugs and alcohol because it was not the primary concern. While Biggs was not concerned whether Mother was currently abusing substances, she reported Mother has recently made comments regarding how "beneficial" drug use was for her and her unborn child (V.T.). Mother made comments such as, "it saved their lives," "that's what she needed to do during pregnancy to save them both." Because Mother self-reports, it is difficult to ascertain whether she is medication compliant. Mother has been diagnosed as schizoaffective, she has medical needs, and she reported suffering from difficulty walking, breathlessness, pain in her legs, and mobility issues. Mother would like an electronic mobility device or scooter to assist her. Mother's mental health impacts her ability to care for the children because she has disorganized thoughts. She is not able to understand the children's needs even when the needs are explained and information is given. For instance, Mother construed T.T.'s struggle to hold her bottle as an attempt to aggravate Mother. Mother also does not appear to understand certain medical conditions, such as believing a mass in T.T.'s lungs was "from the weather" because T.T. was born in February and V.T. did not have the same issue because she was born in June; and believing she contracted diabetes and a "nervous belly" from being startled in her sleep during a stay at a women's shelter.

Case Nos. 2025-L-103, 2025-L-104

{¶19} Mother also participates in Crossroads Early Head Start services, which includes a home visitor who supervises Mother's visits with the children. Mother does not always appreciate the home visitor's suggestions and comments. Biggs described one visit where the home visitor was discussing with Mother how well V.T. played with toy food for her age. Mother disagreed, stating she "thought it was babyish" and V.T. was trying to aggravate her. Mother did ask the home visitor questions, such as the age-appropriateness of certain toys and activities. Mother did not initially attend her scheduled visits with V.T. She began sporadically attending visitations with V.T. after T.T. was born. Each child had a half-hour visit with Mother. In the fall of 2024, T.T. was medically allowed to be around other children, and 1-hour and 45-minute visitations were held with both children and Mother. Mother's cancellations became less frequent, and in January 2025, she started attending the visitations regularly. Biggs described the visits as "typically not unsafe in nature" and "there's not a ton of interaction." Mother asks the children to get their own diaper bags because Mother cannot move easily. Sometimes Mother plans activities or brings toys. At other times, Mother appears irritated, and she becomes frustrated when the children refuse to follow her directions. Visitation time never progressed because Mother failed to make any progress obtaining suitable housing and understanding the children's needs. V.T. will reach for her foster mother when she sees her but does not do so when she sees Mother.

{¶20} Mother does not have stable, clean, and safe housing. Mother's homelessness has been an issue since she was evicted from her apartment in November 2023. LCDJFS assigned Mother a caseworker solely for housing. At the time of the hearing, she was staying in a motel. After T.T. was born, Mother alternated staying in the hospital with T.T. and staying in a motel for two weeks at a time. Several months ago,

Mother went to a women's shelter. Mother told Biggs she left the shelter because she does not "want to be there." Mother attempted to work with foundations that assist with housing, such as Project Hope, but she did not want to follow their rules. Mother also has a history of evictions, which affects her eligibility for housing assistance, and she has issues paying the fees for housing applications. Mother feels caught in a cycle of being ineligible for adequate housing because she does not have custody of the children and being unable to regain custody of the children because of her lack of adequate housing. T.T. remains unable to attend day care and needs a permanent home because of her medical issues. Mother told Biggs she planned to hire a nanny to help her take care of the children. Mother's sole source of income is from Social Security disability payments and death benefits from her father. During the past year and a half, Mother did not seek any employment.

### Permanent Custody Granted to LCDJFS

{¶21} On August 7, 2025, in a thorough judgment entry, the trial court found granting permanent custody of V.T. to LCDJFS is in V.T's best interest. Specifically, the court found V.T. has been in the custody of LCDJFS for 12 or more months of a consecutive 22-month period; LCDJFS made reasonable efforts to make it possible for V.T. to return safely home; LCDJFS diligently sought family members to care for V.T.; V.T. is bonded with her foster family; Mother has not demonstrated that she is in a position to provide V.T. with a secure permanent placement or that she has a consistent desire to care for V.T.; Mother still has significant mental health and housing issues; and V.T. is in need of a permanent placement so her long-term care can be more adequately planned. The trial court granted LCDJFS's motion for permanent custody, divested Mother of her parental rights, and granted permanent custody of V.T. to LCDJFS.

Case Nos. 2025-L-103, 2025-L-104

{¶22} On the same day, also in a thorough judgment entry, the trial court found granting permanent custody of T.T. to LCDJFS is in T.T.'s best interest. In relevant part, the trial court found T.T. cannot be placed with either parent within a reasonable time or should not be placed with either parent; T.T. has been in the temporary custody of LCDJFS since June 11, 2024, and was adjudicated a dependent child on August 28, 2024; Mother's past history with her other children and current instability demonstrate T.T. cannot and should not be placed with Mother within a reasonable time; despite LCDJFS's diligent efforts, no other family members have been identified; and T.T. is in need of a permanent placement so her long-term care can be more adequately planned. Further, Mother has failed to continuously and substantially remedy the conditions causing T.T. to be placed outside the home; T.T. has extensive medical needs; Mother has not been able to overcome her issues despite being assisted by LCDJFS; and Mother's chronic mental illness, chronic emotional illness, intellectual disability, physical disability, and occasional chemical dependency issues are so severe she is unable to provide an adequate permanent home now or in the near future. The trial court granted LCDJFS's motion for permanent custody, divested Mother of her parental rights, and granted permanent custody of T.T. to LCDJFS.

{¶23} Mother timely appealed both judgments and raises four assignments of error for our review:

{¶24} "[1.] The Lake County Juvenile Court erred to the prejudice of the appellant when it failed to inquire as to whether either of the children have Indian or Native American ancestry.

{¶25} "[2.] The decision of the Lake County Juvenile Court was against the manifest weight of the evidence.

Case Nos. 2025-L-103, 2025-L-104

{¶26} "[3.] The evidence was insufficient to support permanent custody of the child to the Lake County Department of Job and Family Services.

{¶27} "[4.] The Juvenile Court erred to the prejudice of the Mother by not granting a continuance of the permanent custody trial."

{¶28} We address Mother's assignments of error out of turn and/or jointly for ease of discussion.

**Standard of Review**

{¶29} "'It is well established that a parent's right to raise a child is an essential and basic civil right.'" *In re T.B.*, 2008-Ohio-4415, ¶ 29 (11th Dist.), quoting *In re Phillips*, 2005-Ohio-3774, ¶ 22 (11th Dist.), citing *In re Hayes*, 79 Ohio St.3d 46, 48 (1997). "'The permanent termination of parental rights has been described as the family law equivalent of the death penalty in a criminal case.'" *Id.*, quoting *Phillips* at ¶ 22, citing *In re Hoffman*, 2002-Ohio-5368, ¶ 14. The Supreme Court of Ohio has determined, based upon these principles, that a parent must be afforded every procedural and substantive protection the law allows. *Id.*, citing *Hayes* at 49.

{¶30} The Supreme Court of Ohio set forth the appropriate standard of review for appellate challenges to a trial court's granting of a motion for permanent custody in *In re Z.C.*, 2023-Ohio-4703. In that case, the Court observed:

> Given that R.C. 2151.414 requires that a juvenile court find by clear and convincing evidence that the statutory requirements are met, we agree with those appellate courts that have determined that the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination, as appropriate depending on the nature of the arguments that are presented by the parties. . . .

> Sufficiency of the evidence and manifest weight of the evidence are distinct concepts and are "'both quantitatively and qualitatively different.'" *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 10, quoting *State v. Thompkins*, 78 Ohio

Case Nos. 2025-L-103, 2025-L-104

St.3d 380 (1997), paragraph two of the syllabus. We have stated that "sufficiency is a test of adequacy," *Thompkins* at 386, while weight of the evidence "'is not a question of mathematics, but depends on its *effect in inducing belief*'" (emphasis sic), *id.* at 387, quoting *Black's Law Dictionary* 1594 (6th Ed.1990). "Whether the evidence is legally sufficient to sustain a verdict is a question of law." *Id.* at 386. "When applying a sufficiency-of-the-evidence standard, a court of appeals should affirm a trial court when "'the evidence is legally sufficient to support the jury verdict as a matter of law.'"" *Bryan-Wollman v. Domonko*, 2007-Ohio-4918, ¶ 3, quoting *Thompkins* at 386, quoting *Black's* at 1433.

But "even if a trial court judgment is sustained by sufficient evidence, an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence." *Eastley* at ¶ 12. When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *Id.* at ¶ 20. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *Id.* at fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978).

*In re Z.C.* at ¶ 11, 13-14; *accord In re B.M.H.*, 2025-Ohio-5180, ¶ 15 (11th Dist.).

## Manifest Weight and Sufficiency of the Evidence

{¶31} In her second and third assignments of error, Mother contends the trial court's decisions to grant LCDJFS permanent custody of V.T. and T.T. are not supported by sufficient evidence and are against the manifest weight of the evidence because there was evidence Mother was case compliant and working towards the case plan goals.

{¶32} Mother's general and ambiguous contention that there was insufficient evidence to support the trial court's decisions is belied by the record. LCDJFS introduced

Case Nos. 2025-L-103, 2025-L-104

witness testimony and documentary evidence showing Mother has struggled and continues to struggle with psychiatric, psychological, and physical illness, as well as an intellectual disability. Both children were born prematurely with severe medical issues and are developmentally delayed. Mother was unable and continues to be unable to meet their extensive needs.

{¶33} While Mother argues the evidence reflects she was case compliant and could satisfy the case plan goals if given more time, there is no evidence supporting that assertion. Mother has not had an active role in the underlying case. Mother did not participate in or attend hearings until mid-2024. Mother did not consistently participate in visitations with the children until January 2025. In April 2025, the permanent custody hearing had to be rescheduled because Mother failed to appear due to "mental issues." In July 2025, at the continued permanent custody hearing, Mother left half-way through the hearing to "catch a bus" and did not present any testimony or evidence. Further, she refused to participate in certain housing assistance programs because she "did not want to follow their rules." And, while Mother followed the case plan somewhat by attending her counseling and parenting classes, she did not progress in her visitation time, her parenting skills, or successfully reach the case plan goals and obtain stable housing and employment. Fundamentally, there is no evidence Mother will ever be able to satisfy those goals.

{¶34} In thorough judgment entries, the trial court applied the R.C. 2151.414 analysis as required and supported its findings under each relevant statutory factor. We recognize the gravity of the court's decisions and do not doubt Mother's love for her children, but we cannot say there is insufficient evidence supporting the trial court's determinations.

Case Nos. 2025-L-103, 2025-L-104

{¶35} Nor can we say the trial court lost its way and created such a manifest miscarriage of justice that the judgments must be reversed and a new trial ordered. As our review of the evidence and testimony reveals, the trial court's determinations are not against the manifest weight of the evidence. Mother did not present any evidence or testimony to contradict the overwhelming evidence that she is struggling with illness and unable to provide a permanent home for the children now or within a reasonable time. Even if the evidence was susceptible to more than one interpretation, a reviewing court must interpret it in a manner consistent with the finder of fact's judgment. *See State v. Awan*, 22 Ohio St.3d 120, 123 (1986) ("an appellate court may not substitute its own judgment for that of the finder of fact").

{¶36} Mother's second and third assignments of error are without merit.

**Continuance of the Permanent Custody Hearing**

{¶37} In her fourth assignment of error, Mother contends the trial court erred to her prejudice by failing to grant a continuance when she had to leave mid-hearing.

{¶38} Pursuant to Juv.R. 23, "Continuances shall be granted only when imperative to secure fair treatment for the parties." "'The grant or denial of a continuance is a matter that is entrusted to the broad, sound discretion of the trial judge.'" *In re M.A.S.*, 2019-Ohio-5190, ¶ 15 (11th Dist.), quoting *State v. Unger*, 67 Ohio St.2d 65 (1981), syllabus. "[A]n appellate court will not interfere with the exercise of this discretion unless the action of the court is plainly erroneous and constitutes a clear abuse of discretion." *Id.*, quoting *State ex rel. Buck v. McCabe*, 140 Ohio St. 535, 538 (1942); a*ccord In re B.M.B.*, 2024-Ohio-1214, ¶ 16 (11th Dist.). "An abuse of discretion is the trial court's '"failure to exercise sound, reasonable, and legal decision-making."'" *In re K.S.W.*, 2023-Ohio-3763, ¶ 36

Case Nos. 2025-L-103, 2025-L-104

(11th Dist.), quoting *State v. Beechler*, 2010-Ohio-1900, ¶ 62 (2d Dist.), quoting *Black's Law Dictionary* (8th Ed. 2004).

{¶39}  A review of the record reveals Mother never requested a continuance when she abruptly left the hearing mid-way through Biggs' testimony.  Mother stated, "I got to go, my bus is coming.  Sorry, I didn't know it was a long day."  The court noted for the record that the hearing notice provided Mother with advance warning that the hearing was scheduled for the entire day.

{¶40}  We cannot find the trial court abused its discretion in denying a motion for a continuance that was never made.  As already reviewed, this occurred at the continued permanent custody hearing due to Mother's failure to appear at the first scheduled hearing.  In addition, Mother rarely and sporadically attended other court hearings. Fundamentally, Mother has not demonstrated any prejudice or proffered any testimony or evidence she would have introduced had the hearing been continued.  "'Denials of continuances have been repeatedly affirmed in permanent custody hearings where there is no showing that a grant of the continuance likely would have changed the outcome of the case.'"  *B.M.B.* at ¶ 20, quoting *K.S.W.* at ¶ 41 (upholding denial of a continuance where the appellant "failed to put forth any offer of proof of the evidence and/or testimony she would have presented had she been at the hearing or how the outcome of the proceeding would have been different had she attended").

{¶41}  Mother's fourth assignment of error is without merit.

### Indian or Native American Ancestry

{¶42}  In her first assignment of error, Mother contends the trial court committed plain error because there is no record the trial court inquired into whether the children are of Indian or Native American ancestry as required by law.

Case Nos. 2025-L-103, 2025-L-104

{¶43} At the outset, we note Mother did not raise this as an issue in the trial court, thus she has forfeited all but plain error review on appeal. *See In re L.T.*, 2025-Ohio-1719, ¶ 15 (5th Dist.).

{¶44} Federal regulations pursuant to the Indian Child Welfare Act ("ICWA") provide:

> "State courts must ask each participant in an emergency or voluntary or involuntary child-custody proceeding whether the participant knows or has reason to know that the child is an Indian child. The inquiry is made at the commencement of the proceeding and all responses should be on the record. State courts must instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child."

*In re J.H.*, 2025-Ohio-811, ¶ 15 (11th Dist.), quoting 25 C.F.R. 23.107(a); *see also* 25 U.S.C. 1911(b) ("[i]n any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe"); *see also* Ohio Adm.Code 5101:2-53-02(A) ("Failure to identify Indian children can nullify court proceedings that have not been conducted in accordance with ICWA.").

{¶45} "[T]he party invoking the ICWA bears the burden of establishing that the ICWA is implicated." *In re L.R.D.*, 2019-Ohio-178, ¶ 20 (8th Dist.). "To meet this burden, the party asserting the applicability of the ICWA must do more than simply raise the possibility that a child has Native American ancestry." *Id.* at ¶ 21. "Having Native American ancestry, by itself, does not make one an 'Indian child' for purposes of the ICWA. . . . Rather, the party invoking the act must demonstrate that the child meets the definition of an 'Indian child' under the act." *Id.*

Case Nos. 2025-L-103, 2025-L-104

{¶46} Contrary to Mother's assertion, there is evidence in the record that an ICWA inquiry was made at some point. Each semi-annual review filed by LCDJFS and adopted by the trial court indicates the children are not of Indian or Native American ancestry. Further, the ICWA states the inquiry is to be made "at the commencement of the proceedings," 25 C.F.R. 23.107(a), which includes prior hearings. *See L.T.*, 2025-Ohio-1719, at ¶ 16 (5th Dist.). Because Mother did not provide this court with the transcripts from those hearings, we must presume the trial court conducted such an inquiry at an earlier hearing. *In re K.Y.*, 2025-Ohio-1117, ¶ 35 (5th Dist.) ("Without a transcript to review, we presume the trial court conducted an inquiry at the commencement of these proceedings."); *L.T.* at ¶ 17 ("in the absence of a transcript of the initial hearing wherein Father was present, we must presume Father was asked by the trial court about Native American ancestry").

{¶47} Crucially, Mother does not contend either of the children meets the definition of an "Indian child" under the ICWA nor does she point to any evidence in the record supporting such a contention. *See, e.g., In re L.B.*, 2025-Ohio-2269, at ¶ 46-48 (5th Dist.) (case plan clearly stated minor children were not protected by ICWA and failure of trial court to make inquiry at permanent custody hearing did not affect legitimacy of the proceedings or result in a manifest miscarriage of justice); *In re L.W.*, 2025-Ohio-2236, ¶ 46 (10th Dist.) (because there was no indication from Mother that she or her minor child had Native American heritage, trial court's lack of an ICWA inquiry did not cause a manifest miscarriage of justice); *see also In re B.M.*, 2025-Ohio-1786, ¶ 43-44 (5th Dist.). Thus, Mother failed to carry her burden to demonstrate any error occurred, much less one that rose to plain error.

Case Nos. 2025-L-103, 2025-L-104

{¶48} Mother's first assignment of error is without merit.

{¶49} The judgments of the Lake County Court of Common Pleas, Juvenile Division, are affirmed.


JOHN J. EKLUND, J.,

ROBERT J. PATTON, J.,

concur.

## JUDGMENT ENTRY

For the reasons stated in the opinion of this court, appellant's assignments of error are without merit.  It is the judgment and order of this court that the judgments of the Lake County Court of Common Pleas, Juvenile Division, are affirmed.

Costs to be taxed against appellant, E.T.

_____
PRESIDING JUDGE MATT LYNCH

_____
JUDGE JOHN J. EKLUND,
concurs

_____
JUDGE ROBERT J. PATTON,
concurs

---

**THIS DOCUMENT CONSTITUTES A FINAL JUDGMENT ENTRY**

A certified copy of this opinion and judgment entry shall constitute the mandate pursuant to Rule 27 of the Ohio Rules of Appellate Procedure.

---

Case Nos. 2025-L-103, 2025-L-104